# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| FIFTH THIRD BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| THE AMENDED AND RESTATED | ) | |
| SHREIBMAN REVOCABLE TRUST, | ) | |
| AMNON SHREIBMAN, and | ) | |
| RUTH SHREIBMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT FOR APPOINTMENT OF RECEIVER, INJUNCTIVE RELIEF AND DAMAGES

Fifth Third Bank, an Ohio banking corporation, as successor by merger with Fifth Third Bank, N.A., hereby avers as follows for its Verified Complaint (this "Complaint") against Defendants The Amended and Restated Shreibman Revocable Trust, a trust organized under the laws of the State of Tennessee, Amnon Shreibman, an individual, and Ruth Shreibman, an individual:

### PARTIES, JURISDICTION AND VENUE

1.     Fifth Third Bank ("Plaintiff" or "Fifth Third") is an Ohio banking corporation organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio. Fifth Third's business relationship with The Amended and Restated Shreibman Revocable Trust under agreement dated November 26, 2007, Amnon Shreibman and Ruth Shreibman originated in Davidson County, Tennessee.

2.     The Amended and Restated Shreibman Revocable Trust under agreement dated November 26, 2007 (the "Trust") is a revocable trust organized under the laws of the State of

Tennessee. Upon information and belief, the *situs* of the Trust is P.O. Box 177, LaVergne, Tennessee 37086. At all times relevant to this Complaint, the Trust engaged in business transactions, managed assets and/or owned real property in Rutherford County, Tennessee and Davidson County, Tennessee. The claims asserted against the Trust in this Complaint arise out of the business conducted by the Trust, its management of assets and ownership of property in Rutherford County, Tennessee and Davidson County, Tennessee.

3.    Amnon Shreibman ("Amnon Shreibman") is an individual who, upon information and belief, resides in LaVergne, Tennessee. At all times relevant to this Complaint, Amnon Shreibman conducted business in Rutherford County, Tennessee and Davidson County, Tennessee, and acted as the Trustee (the "Trustee") of the Trust. The claims asserted against Amnon Shreibman in this Complaint arise out of the business conducted by Amnon Shreibman in Rutherford County, Tennessee and Davidson County, Tennessee, as well as his conduct as Trustee of the Trust.

4.    Ruth Shreibman ("Ruth Shreibman," with Amnon Shreibman, each a "Guarantor" and collectively, the "Guarantors") is an individual who, upon information and belief, resides in part in LaVergne, Tennessee.  On information and belief, Ruth Shreibman also resides in part in the State of Israel.  At all times relevant to this Complaint, Ruth Shreibman conducted business in Rutherford County, Tennessee and Davidson County, Tennessee. The claims asserted against Ruth Shreibman in this Complaint arise out of the business conducted by Ruth Shreibman in Rutherford County, Tennessee and Davidson County, Tennessee. The Trust and the Guarantors are collectively referred to hereinafter as the "Defendants."

5. The facts and circumstances giving rise to the claims asserted in this Complaint arose, and the contracts on which the claims in this Complaint are based were executed, in Davidson County, Tennessee.

6. Plaintiff seeks legal and equitable relief against the Defendants, including without limitation appointment of a receiver, segregation of rents, and injunctive relief.

7. Venue is proper in the United States District Court for the Middle District of Tennessee.

8. The amount in controversy with respect to this Complaint is greater than $75,000.

9. This Court has jurisdiction over this case and the parties in accordance with 28 U.S.C. § 1332.

## FACTUAL ALLEGATIONS

**A.     The Loan**

10. On November 26, 2007, the Trust entered into that certain Amended, Restated and Supplemental Loan Agreement with Fifth Third (as amended, restated, supplemented or otherwise modified, the "Loan Agreement"), pursuant to which Fifth Third agreed to make loan advances to the Trust of up to $15,000,000 (the "Loan"), subject to certain collateral requirements. Pursuant to the Loan Agreement, the amount available to the Trust under the Loan was dependent upon the value of the collateral pledged to Fifth Third. On July 10, 2008, the Trust entered into that certain First Amendment to the Amended, Restated and Supplemental Loan Agreement (the "First Amendment"), by which the Trust pledged additional collateral and increased the total actual availability under the Loan to $13,668,000.00. The outstanding principal balance, accrued interest and account overdraft fees due under the Loan as of June 7,

2010 was an amount no less than $13,794,729.54. A true and correct copy of the Loan Agreement and First Amendment is attached hereto collectively as Exhibit A.

11.     The primary purpose of the Loan was to refinance an existing loan and provide additional funds for the purchase of certain additional parcels of land improved by residential dwellings, which constitute part of the Collateral (as defined below). In order to obtain the Loan, the Trust was required to execute the Loan Agreement and other documents evidencing and securing its obligations to Fifth Third. The Collateral is located in Rutherford County, Tennessee and Davidson County, Tennessee. The Trust is currently in possession of the Collateral.

12.     In order to further evidence its obligations to Fifth Third under the Loan Agreement, the Trust executed and delivered to Fifth Third that certain Amended, Restated, and Supplemental Promissory Note (the "2007 Note"), dated as of November 26, 2007, in the aggregate principal amount of $11,250,000. In connection with the increase in availability under the Loan pursuant to the First Amendment, the Trust executed and delivered a Second Amended, Restated, and Supplemental Promissory Note (the "Promissory Note"), dated as of July 10, 2008, in the aggregate principal amount of $13,668,000. The Promissory Note amended and restated the 2007 Note. A true and correct copy of the Promissory Note is attached hereto as Exhibit B.

13.     The Trust secured its obligations to Fifth Third under the Loan Agreement and the Promissory Note by executing and delivering to Fifth Third that certain Amended, Restated, Supplemental and Consolidated Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement (as amended, restated, or otherwise modified, the "Deed of Trust"), dated as of November 26, 2007. The Deed of Trust was properly recorded in the Rutherford County, Tennessee Register of Deeds Office in Record Book 804, page 1888 and in the Davidson County, Tennessee Register of Deeds Office as Instrument No. 20071212-0143121. A true and

correct copy of the Deed of Trust is attached hereto as <u>Exhibit C</u>. In order to obtain the increase in total availability under the Loan in connection with the First Amendment, the Trust also executed and delivered to Fifth Third that certain First Amendment to Amended, Restated, Supplemental and Consolidated Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement (the "Deed of Trust Amendment"), dated as of July 10, 2008. The Deed of Trust Amendment was properly recorded in the Rutherford County, Tennessee Register of Deeds Office in Record Book 859, page 2920 and in the Davidson County, Tennessee Register of Deeds Office as Instrument No. 20080806-0081122. A true and correct copy of the Deed of Trust Amendment is attached hereto as <u>Exhibit D</u>. The Deed of Trust and the Deed of Trust Amendment are collectively referred to hereinafter as the "Deed of Trust".

14. Pursuant to the Deed of Trust, Fifth Third has a first-lien mortgage in the Mortgaged Property (as further described in the Deed of Trust, the "Mortgaged Property"), which includes, without limitation:

(a) the real estate described on Exhibit A to the Deed of Trust and Exhibit A to the Deed of Trust Amendment (the "Land);

(b) all buildings, improvements, alterations or appurtenances now, or at any time hereafter, located upon the Land or any part thereof (the "Buildings");

(c) all fixtures (excluding tenant trade fixtures) now or hereafter affixed or attached to, or installed in, or used in connection with, the Land or Buildings, whether or not permanently affixed thereto, together with all accessions, replacements and substitutions thereto or therefor and the proceeds thereof (as further described in the Deed of Trust, the "Fixtures");

(d)    any and all leases, subleases, licenses, concessions or grants of other possessory interests now or hereafter in force, oral or written, covering or affecting the Land or Buildings, or any part thereof, together with all rights, powers, privileges, options and other benefits of the Trust thereunder (the "Leases");

(e)    all of the Trust's right, title and interest in and to all of the rents, royalties, issues, profits, revenue, income and other benefits of the Land and Buildings arising from the use or enjoyment of all or any portion thereof or from any present and future lease or agreement pertaining thereto, together with any Lease (including any sublease), occupancy agreement, license or concession agreement pertaining thereto, together with all extensions, renewals, modifications or replacements of said leases, occupancy agreements, licenses, and concession agreements arising from the use or enjoyment of all or any portion of the Land and Buildings, or from any lease together with any and all guaranties of the obligations of the lessees, occupants and licensees thereunder, whether now due, past due, or to become due, and including all prepaid rents and security deposits (the "Rents");

(f)    all tangible and intangible personal property of the Trust (whether now owned or hereafter acquired), including all equipment, inventory, goods, consumer goods, chattel paper, instruments, working capital reserves, project escrows, money (which are rental, tax or insurance deposits), General Intangibles, documents, minerals, crops and timber (as those terms are defined in the applicable Uniform Commercial Code) and all other personal property of the Trust which is attached to, installed on or placed or used on, in connection with or is acquired for such attachment, installation, placement or use, or which arises out of the development, improvement, financing,

leasing, operation or use of (i) the Land together with all rights, titles and interests appurtenant thereof, (ii) any and all Buildings, structures, open parking areas and other improvements, now or any time hereafter situated, placed or constructed upon the Land or any part thereof, (iii) the Fixtures, or (iv) other goods located on the Land or Buildings, together with all additions, accessions, accessories, amendments and modifications thereto, extensions, renewals, replacements, enlargements and proceeds thereof, substitutions therefor, and income and profits therefrom, and all materials, supplies, equipment, apparatus and other items now or hereafter attached to, installed on or in the Land or the Buildings, or which in some fashion are deemed to be fixtures to the Land or Buildings under the laws of the State of Tennessee, including the Tennessee Uniform Commercial Code (the "Personalty");

(g)     all of the rights, privileges, permits, licenses, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances of the Land and/or the Buildings, including, without limitation, all air rights, light, water rights, water stock, development rights and credits, use entitlements, permits, licenses and approvals of governmental entities, belonging or in anyway appertaining thereto and all right, title and interest of the Trust in and to any streets, ways, alleys, strips or gores of land adjoining the Land or any part thereof or otherwise benefiting the same;

(h)     all the estate, right, title, interest, claim or demand whatsoever of the Trust, either at law or in equity, in and to the Land (including, without limitation, water, mineral and sewer rights), the Buildings, the Fixtures, the Leases, the Rents and the Personalty;

(i)     all the estate, right, title, interest, claim or demand whatsoever of the Trust, either at law or in equity, in and to the Awards (as defined in the Deed of Trust), or payments with respect to casualties;

(j)     all other interest of every kind and character which the Trust now has or at any time hereafter acquires in and to the above described real and personal property; and

(k)     and all substitutions therefor, replacements and accessions thereto, and proceeds derived therefrom. (See Exhibit C, § 3.1).

15.     The Deed of Trust also grants Fifth Third a security interest under Article 9 of the Uniform Commercial Code. Fifth Third has a properly perfected, first-priority lien against and security interest in all rights, titles, and interests now owned or later acquired by the Trust in all Personalty, Fixtures and other collateral constituting a part of the Mortgaged Property (collectively, the "Secured Property"). Included within the definition of Personalty under the Deed of Trust is all "money (which are rental, tax or insurance deposits)…which arises out of the development, improvement, financing, leasing, operation or use of (i) the Land together with all rights, titles and interests appurtenant thereof, (ii) any and all Buildings, structures, open parking areas and other improvements, now or any time hereafter situated, placed or constructed upon the Land or any part thereof, (iii) the Fixtures, or (iv) other goods located on the Land or Buildings…." (See Exhibit C, Deed of Trust, § 2.25).  Financing statements perfecting Fifth Third's security interest in the Secured Property are on record as Instrument No. 108-025293 with the Tennessee Secretary of State, Record Book 804, page 1936, as amended in record Book 859, page 2925 in the Rutherford County Register of Deeds Office, and Instrument No. 20071212-0143121, as amended by Instrument No. 20080806-0081123 in the Davidson County Register of Deeds Office.

16.     The Deed of Trust also assigns and transfers to Fifth Third all of the Trust's "right, title, interest, and estate" in all and to the following (collectively, the "Assigned Property"):

(a)     the Leases;

(b)     all future leases, rents and profits now or hereafter arising under the Leases and otherwise with respect to the Mortgaged Property or any part thereof ;

(c)     any sums to which the Trust may become entitled in any court proceeding involving the bankruptcy, insolvency or reorganization of any occupant; and

(d)     any payments made by any occupant in lieu of rent. (See Exhibit C, Deed of Trust, § 5.1).

Pursuant to the Deed of Trust, Fifth Third has a properly perfected, first-priority security interest in all Rents received by the Trust in connection with the Mortgaged Property. While the Trust is entitled to collect the Rents so long as no Event of Default has occurred, an Event of Default has occurred under the Loan Agreement and, consequently, under the Deed of Trust as well. (See Exhibit C, Deed of Trust § 5.4). Accordingly, the Trust is no longer entitled to collect the Rents. For the purposes of this Complaint, the Mortgaged Property, the Secured Property and the Assigned Property are collectively referred to as the "Collateral."

17.     In order to further secure the Trust's obligations under the Loan Agreement, Defendant Amnon Shreibman executed and delivered to Fifth Third that certain Guaranty Agreement (the "2007 Amnon Shreibman Guaranty"), dated as of November 26, 2007. In connection with the First Amendment, Amnon Shreibman executed and delivered to Fifth Third that certain Amended, Restated and Supplemental Guaranty Agreement (the "Amnon Shreibman Guaranty"), dated as of July 10, 2008, which amended, restated and supplemented the 2007

Amnon Shreibman Guaranty. A true and correct copy of the 2007 Amnon Shreibman Guaranty and the Amnon Shreibman Guaranty is attached hereto as collective Exhibit E.

18.     In addition to the Amnon Shreibman Guaranty, Defendant Ruth Shreibman executed and delivered to Fifth Third that certain Guaranty Agreement (the "2007 Ruth Shreibman Guaranty"), dated as of November 26, 2007, in order to further secure the Trust's obligations under the Loan Agreement. In connection with the First Amendment, Ruth Shreibman, through Amnon Shreibman, her attorney-in-fact, executed and delivered to Fifth Third that certain Amended, Restated and Supplemental Guaranty Agreement (the "Ruth Shreibman Guaranty," together with the Amnon Shreibman Guaranty, the "Guaranties"), dated as of July 10, 2008, which amended, restated and supplemented the 2007 Ruth Shreibman Guaranty. A true and correct copy of the 2007 Ruth Shreibman Guaranty and the Ruth Shreibman Guaranty is attached hereto as collective Exhibit F.

19.     Finally, Fifth Third and the Trust are parties to that certain ISDA Master Agreement, dated as of November 20, 2007, and Schedules and Confirmations related thereto (collectively, the "Swap Agreement"). A true and correct copy of the Swap Agreement is attached hereto collectively as Exhibit G. Pursuant to the Swap Agreement, the Trust had the option to exchange, from time to time, certain interest rates set forth in the Loan Agreement and Promissory Note for other interest rates pursuant to the terms of the Swap Agreement. In this Complaint, the Loan Agreement, the Promissory Note, the Deed of Trust, the Guaranties, the Swap Agreement, and all documents executed in connection therewith, as applicable, are collectively referred to as the "Loan Documents."

**B.     Defaults**

20.     Pursuant to Sections 2.02 and 2.03 of the Loan Agreement, the Loan was

scheduled to mature on November 26, 2014 (the "Maturity Date"). However, prior to the Maturity Date, the Trust defaulted on its obligations under the Loan Agreement and other Loan Documents. Amnon Shreibman and Ruth Shreibman also defaulted on their obligations under the Guaranties. The defaults are current and continuing.

21.    The Trust is in default of the Loan Agreement for failing to pay property taxes with respect to the Land and improvements in an amount, as of June 7, 2010, of no less than $135,991.00. Section 6.01(c) of the Loan Agreement provides that if the Trust defaults in the performance of any term, covenant or agreement contained in the Loan Agreement, each default shall constitute an Event of Default under the Loan Agreement.   Section 4.01(b) of the Loan Agreement provides that the Trust will pay all taxes, assessments and governmental charges or levies imposed upon the Trust or any property belonging to the Trust.   Section 6.01(d) of the Loan Agreement provides that a failure of the Trust to pay any Indebtedness (which expressly includes taxes payable) in an amount in excess of $100,000 constitutes an Event of Default. Accordingly, the Trust's failure to pay the property taxes constitutes an Event of Default under the Loan Agreement.

22.    Moreover, the Trust is in default of the Loan Agreement for breaching additional covenants in the Loan Agreement, including Section 4.02(c), which provides that the Guarantors will not permit the Interest Service Coverage Ratio to be less than 1.8 to 1.0 for any calendar year during the term of the Loan Agreement. "Interest Service Coverage Ratio" means, for any fiscal period, the EBITDA for such period divided by the interest on all Indebtedness (as defined in the Loan Agreement) paid or payable by the Trust or any of the Guarantors during such period. For calendar year 2008, the Interest Service Coverage Ratio was 1.13 to 1.00. Because this ratio was less than 1.8 to 1.0, the Trust and/or the Guarantors have breached the covenant set

forth in Section 4.02(c) of the Loan Agreement and have, therefore, caused an Event of Default pursuant to Section 6.01(c) of the Loan Agreement.

23. The Trust is also in default of the Loan Agreement for failing to pay amounts due and owing under the Swap Agreement. Section 6.01(c) of the Loan Agreement provides, among other things, that the Trust shall be in default under the Loan Agreement if the Trust fails to pay any Rate Management Obligation (as defined in the Loan Agreement) when due or breaches any term, provision or condition contained in any Rate Management Agreement (as defined in the Loan Agreement). Included in the definition of "Rate Management Agreement" is the Swap Agreement. Section 2(a)(i) of the Swap Agreement between Fifth Third and the Trust requires each party thereto to make payment or delivery specified in each "Confirmation" of a "Transaction" made by it (as such terms are defined in the Swap Agreement). Pursuant to three (3) separate Confirmations, effective April 10, 2008, July 10, 2008 and December 10, 2008, respectively, the Trust agreed to pay Fifth Third (or Fifth Third agreed to pay the Trust, as the case may be) various sums on the tenth day of each month following such applicable effective date. Since the effective date of each Confirmation, Fifth Third has (i) debited the Trust's account at Fifth Third, on or about the tenth of each month, if the Trust owed Fifth Third according to the applicable monthly statement or notice produced pursuant to each Confirmation, or (ii) credited such account, on or about the tenth of each such month, if Fifth Third owed the Trust according to each statement or notice. On or about December 7, 2009, the Trust was notified in writing that it would owe Fifth Third the sum of $42,870.79, pursuant to the three Confirmations. On or about January 10, 2010, the Trust's account at Fifth Third was debited in the amount of such sum. This debit created, however, an overdraft in the Trust's account in the amount of $42,835.51. Since the creation of that overdraft, Fifth Third, on numerous occasions,

has asked and advised the Trustee to cover such overdraft. The Trustee has refused to cover such overdraft on each such occasion and has explicitly informed Fifth Third that it has no intention at all to cover this overdraft at any time. Because the Trustee has advised Fifth Third that the Trust did not and will not approve or authorize the payment of the sums due January 2010, and continuing monthly thereafter pursuant to the Confirmations and the Swap Agreement, the Trust has failed to make payment and delivery of sums specified in the Confirmations. Therefore, the Trust has breached Section 2(a)(i) of the Swap Agreement. Such breach constitutes an Event of Default under Section 6.01(c) of the Loan Agreement.

24.     The Trust's default under the Loan Agreement, as set forth in paragraph 23 above, stems from the following specific defaults under the Swap Agreement. First, Section 5(a)(i) of the Swap Agreement, as modified by the Schedule thereto, provides that if a party thereto fails to make, when due, any payment under the Swap Agreement and such failure is not remedied on or before the first "Local Business Day" (as defined in the Swap Agreement) after notice of such failure is given to that party, then such failure shall constitute an event of default under the Swap Agreement. Because the Trustee has refused, and continues to refuse, to pay or otherwise grant authorization of the payment of sums arising pursuant to and specified in the three Confirmations described above, the Trust has defaulted under the Swap Agreement.

25.     Second, Section 5(a)(iii) of the Swap Agreement, as modified by the Schedule thereto, provides that if a party thereto or a "Credit Support Provider" (which includes any Guarantor) fails to comply with or perform any agreement or obligation in accordance with any "Credit Support Document" (as defined in the Swap Agreement), then such failure shall constitute an event of default under the Swap Agreement. Because the Trust and/or each Guarantor has failed to comply with provisions of a Credit Support Document, specifically

Section 4.02(c) of the Loan Agreement (as detailed above), there are additional events of default under the Swap Agreement.

26.     Third, Section 5(a)(vi) of the Swap Agreement, as modified by the Schedule thereto, provides that if there is a default or event of default in respect of any party to the Swap Agreement or any "Credit Support Provider" of such party (which includes any Guarantor) under any agreement relating to indebtedness (which includes the Loan Agreement) and such default would result in such indebtedness becoming capable of being declared due and payable under such an agreement relating to that indebtedness, then such a default or event of default would constitute an event of default under the Swap Agreement. Because the Trust and/or each Guarantor has created Event of Defaults under the Loan Agreement, as described above, such Events of Default under the Loan Agreement create events of default under the Swap Agreement.

27.     Pursuant to Section 14(b) of the Promissory Note, any "Event of Default" under the Loan Agreement constitutes an "Event of Default" under the Promissory Note.

28.     Pursuant to Section 5.4 of the Deed of Trust, any "Event of Default" under the Loan Agreement constitutes an "Event of Default" under the Deed of Trust.

29.     The Trust was notified of the Events of Default set forth in paragraphs 22 through 26 by Fifth Third in a letter dated January 29, 2010 (the "Default Notice"). A true and correct copy of the Default Notice is attached hereto as Exhibit H.  By the terms of the Default Notice, the Trust and the Guarantors were required to immediately cure all of the defaults set forth therein or to pay all amounts due and owing under the Loan Documents by February 10, 2010. The Trust and the Guarantors neither cured the defaults set forth in the Default Notice nor made payment of all amounts due and owing under the Loan Documents on February 10, 2010, or

thereafter. Accordingly, all amounts as set forth in paragraph 31 below are presently due an owing.

30.     All of the defaults under the Loan Documents, including, without limitation, those defaults specifically set forth above are hereinafter referred to individually as an "Event of Default" and collectively as "Events of Default."

**C.     The Deficiency**

31.     As of June 7, 2010, the outstanding principal balance and accrued interest under the Loan is no less than $13,586,175.79. In addition to this amount of principal and interest, the Trust is also liable for account overdraft charges in an amount, as of June 7, 2010, of no less than $208,553.75, certain late charges and Fifth Third's costs of collection, including attorneys' fees pursuant to Section 7.03 of the Loan Agreement and Section 7.5 of the Deed of Trust. Moreover, the Trust and the Guarantors are liable under the Swap Agreement on account of the accruing charges, interest, fees and expenses related thereto. Accordingly, the Trust and the Guarantors are jointly and severally liable to Fifth Third in an amount in excess of $13,794,729.54. Pursuant to Section 15 of the Promissory Note, interest will continue to accrue on the outstanding principal balance at a rate equal to the maximum rate allowed by law until such amount is paid in full and Fifth Third expressly reserves the right to charge default rates of interest as set forth in the Loan Documents. Overdraft charges, interest, fees and expenses, including attorney fees, will continue to accrue under the Swap Agreement and termination fees, estimated to be $873,000.00 as of June 7, 2010, and damages will become due under the terms of the Swap Agreement in the event the Swap Agreement is terminated.

32.     As set forth above, the Trust and the Guarantors have failed upon demand to pay the amounts due and owing under the Loan Documents.

## COUNT I
### (Appointment of Receiver)

33.     Fifth Third incorporates the averments of the preceding paragraphs as if fully set forth herein.

34.     This Court has the legal and equitable power to appoint a receiver to take possession of the Collateral for the preservation of such Collateral, including specifically the management of the Mortgaged Property and collection of Assigned Property, including specifically the Rents, pursuant to the terms of the Deed of Trust, pending the outcome of any litigation or as justice otherwise requires. Receiverships are actions in equity which look to the discretion of the Court. Federal courts have traditionally appointed receivers to curtail waste of property in order to protect the rights of secured parties such as Fifth Third.

35.     Fifth Third is entitled to appointment of a receiver pursuant to Section 5.7 of the Deed of Trust. Upon and during an Event of Default, or an event which with notice or lapse of time or both would become an Event of Default (as further described in the Loan Agreement) Fifth Third, effectively immediately, is authorized:

> to enter and take possession of the Mortgaged Property, or any part thereof, and to manage and operate the same, to collect rents, to let or re-let the Mortgaged Property or any part thereof, to cancel and modify Leases, to evict occupants, to bring or defend any suits in connection with possession of the Mortgaged Property in its own name or [the Trust's] name, to make such repairs, alterations and improvements as [Fifth Third] deems appropriate, and to perform any other acts in connection with management and operation of the Mortgaged Property as [Fifth Third], in its discretion, may deem appropriate *or to have a receiver appointed by any court of competent jurisdiction to do any or all of the foregoing on behalf of [Fifth Third].*" (See Exhibit C, Deed of Trust, § 5.7 (emphasis added)).

36.     Therefore, Fifth Third has both a contractual and an equitable right to the appointment of a receiver over the Collateral, including specifically the Mortgaged Property, and all receipts received there from. When reviewing an application for appointment of a receiver,

factors the Court may consider are: (i) the existence of a valid claim by the party seeking appointment; (ii) the probability of current or future fraud; (iii) imminent danger to the property; and (iv) the likelihood that the appointment of a receiver will do more good than harm.

37.     Grounds for the appointment of a receiver are present. The Events of Default in and of themselves entitle Fifth Third to the appointment of a receiver pursuant to the express terms of the Loan Documents.

38.     Fifth Third is entitled to the appointment of a receiver to take possession of and to manage the Collateral, including specifically the Mortgaged Property, for the benefit of Fifth Third, including, without limitation, seeking a buyer or some other disposition of the Collateral if such action is deemed to be in the best interest of Fifth Third. In the event a sale of any of the Collateral is deemed appropriate, Fifth Third believes that a neutral receiver will aggressively market and obtain the best price for the Collateral, which will in turn allow Fifth Third to recover the maximum amount possible. Deterioration of the financial and physical condition of the Collateral will reduce the value of the Collateral, result in irreparable harm to Fifth Third, and will leave Fifth Third without an adequate remedy at law, inasmuch as the Collateral is the primary source of recovery for Fifth Third.

39.     Fifth Third requests that Cumberland & Ohio Co. of Texas ("Cumberland"), through its President, James A. Skinner, Jr. ("Skinner"), be appointed Receiver (the "Receiver") in this matter. Fifth Third believes that Cumberland's appointment as Receiver is in the best interests of Fifth Third, the Defendants, and any other parties who might assert an interest in the Collateral. Furthermore, Fifth Third believes Cumberland and Skinner to have the requisite skills and resources to be the Receiver in this case. A copy of Skinner's credentials is attached hereto as Exhibit I.

40. Fifth Third further requests that the Court grant the Receiver all the rights, powers, duties, authority, and protections ordinarily granted to a receiver and necessary to take possession of, maintain, and preserve the Collateral, including, without limitation, (a) the obligation to provide monthly operating reports to Fifth Third reflecting the financial performance of the Mortgaged Property and status in such form and content, and by such time, as required by Fifth Third or Order of this Court; (b) the right to market and, if appropriate, sell any of the Collateral, or any part thereof, pursuant to 28 U.S.C. § 2001, et seq., upon the request of Fifth Third and in accordance with terms hereafter approved by Fifth Third and the Court; (c) the right to retain the current management company, or terminate the current management company and hire another professional management company, on terms approved by Fifth Third and the Court, to assist the Receiver in managing the Collateral; (d) the right to hire an accountant, attorney and/or other professionals, upon reasonable notice to Fifth Third and subject to Court approval of such engagement and any applications for compensation; (e) the right to audit the books and records of the Trust or the Guarantors, and any other related person or entity related to the Collateral; and (f) the right to use the revenues generated from the Collateral to pay the reasonable and necessary expenses of managing the Collateral, including the Receiver's fees and expenses, in accordance with such operating budgets approved by Fifth Third and/or this Court.

41. Fifth Third further requests that the Receiver's compensation be paid monthly in arrears from the revenues generated from the Collateral in an amount equal to $200 per hour, plus the Receiver's reasonable and necessary out-of-pocket expenses directly related to the Collateral, including the fees and expenses of any professionals engaged by the Receiver by authority of the Court; provided however, Fifth Third requests that prior to the Receiver receiving any compensation or reimbursement of any expenses, the Court require the Receiver to

submit monthly reports to Fifth Third by the twenty-fifth (25th) day of each month documenting his time and expenses, and the time and expenses of any professionals engaged by him, for the immediately preceding month. Fifth Third shall have ten (10) days following the Receiver's submittal of such monthly reports to object to any fees and expenses included in the report. Accordingly, Fifth Third reserves the right to object to any fees or expenses Fifth Third believes to be unreasonable.

42.     Finally, Fifth Third requests that the Receiver be required to post a Receiver's Bond in an amount equal to One Thousand and No/100 Dollars ($1,000.00)

## COUNT II
### (Injunctive Relief)

43.     Plaintiff incorporates the averments of the preceding paragraphs as if fully set forth herein.

44.     In order to fortify the Receiver appointed by this Court, and to protect the interests of Fifth Third, Fifth Third requests that this Court enter a preliminary injunction to take effect and remain in effect for the duration of this case, or until further order of this Court. Without an injunction to bolster the Receiver's powers, it is unlikely that the receivership will succeed.

45.     Fifth Third is entitled to preliminary and permanent injunctive relief if: (i) Fifth Third is likely to prevail on the merits of its claims; (ii) Fifth Third would suffer an irreparable injury if the Court does not grant a preliminary injunction; (iii) a preliminary injunction would not cause substantial harm to others; and (iv) a preliminary injunction would be in the public interest.

46.     Each of these elements is met in this case. The proof is uncontroverted that the Trust has defaulted on the Loan Documents. Pursuant to Section 5.7 of the Deed of Trust, Fifth

Third is entitled to the appointment of a receiver upon an Event of Default. Furthermore, pursuant to Section 5.1 of the Deed of Trust, the Trust is no longer entitled to collect any Rents after an Event of Default. The likelihood that Fifth Third will prevail on the merits of this case is great.

47.     Due to the Events of Default described above, the Trust is violating Fifth Third's rights and impairing the Collateral. Because of the nature of the cash Collateral, and the proceeds thereof, and their ability to be dissipated, concealed or removed from this Court's jurisdiction, and furthermore, because of the nature of the Collateral and the potential for loss of business goodwill, Fifth Third will suffer imminent harm and irreparable injury and will be left without an adequate remedy at law unless Fifth Third is granted immediate injunctive relief to bolster the Receiver.

48.     The proper and public handling of this matter through this Court will benefit the public interest. The residential property that constitute part of the Collateral are occupied by members of the community. Any delay in a receiver being provided with the authority to develop, operate, manage and preserve the Collateral will result in irreparable harm to both Fifth Third and the residents as the Collateral deteriorates.

49.     Finally, there is little foreseeable harm to the Defendants that could result from the granting of injunctive relief or the appointment of the Receiver. A preliminary injunction and receivership will merely preserve the status quo. More importantly, the granting of temporary injunctive relief and appointment of a receiver will protect the value of the Collateral. It is more likely that substantial harm will occur to the Collateral if the Receiver is not appointed nor sufficiently fortified with the authority necessary to develop, manage, operate, and preserve the Collateral, than may occur if the injunctive relief or receivership are granted.

50.     Accordingly, for the reasons stated herein, Fifth Third requests this Court to:

(a)     enter a preliminary injunction against the Defendants, and their successors, assigns, agents, employees, attorneys, or anyone acting for or in concert with them: (1) enjoining them from possessing or managing the Collateral and from interfering in any way with the possession or management of the Collateral by the Receiver; (2) enjoining them from collecting, withdrawing, transferring, conveying, concealing, or otherwise disposing of the Collateral, including cash Collateral, and the proceeds derived therefrom, and any insurance proceeds during and pending the appointment of the Receiver; (3) requiring them to pay the cash Collateral and the revenues derived therefrom to the Receiver; (4) enjoining them from removing any property from the Collateral and from removing, destroying, concealing, changing, or altering in any manner any of the books or records relating to the ownership, possession, or operation of the Collateral; (5) requiring them to pay and turn over immediately to the Receiver and to perform all acts necessary to transfer to the Receiver all funds on hand in cash and all funds held in deposit accounts of or for the benefit of the Collateral arising from the ownership, possession, or operation of the Collateral and all accounts, accounts receivable, and any other collectibles (including insurance proceeds) and all keys, books, records, equipment, and all things in any manner related to the ownership, possession or operation of the Collateral;

(b)     enter a preliminary injunction enjoining the Defendants to this action, or any party who is provided with notice of the Court's order, from prosecuting any claim against the Trust or the Collateral, other than in this action and only after proper motion is filed and an order is entered allowing such party to file such claim herein;

(c)     directing all residents of residential property constituting Collateral, and any other obligors to pay the Receiver directly any amounts owed to either the Trust or the Guarantors on account of the Collateral; and

(d)     on final trial of this cause, enter a permanent injunction consistent with the above preliminary injunctions, except as modified to the extent necessary to protect Fifth Third's interests in the Collateral.

51.     Fifth Third will provide prior notice to the Defendants of any hearing on its request for injunctive relief.

## COUNT III
### (Default under Loan Documents by the Trust)

52.     Fifth Third incorporates the averments of the preceding paragraphs as if fully set forth herein.

53.     The Trust is in default of its obligations under the Loan Documents, including those obligations set forth above.

54.     As a result of the Trust's default on its obligations under the Loan Documents, Fifth Third is entitled to judgment against the Trust in an amount no less than $13,794,729.54, plus interest at a rate equal to the maximum rate allowed by law, late charges, and costs of collection, including attorneys' fees and expenses, that have accrued and will accrue until such judgment is paid in full, plus any Swap Agreement termination fees, plus amounts necessary to cover current unpaid property taxes as of June 7, 2010 in an amount no less than $135,991.00 and additional property and other taxes assessed against the Collateral.

## COUNT IV
### (Default under Guaranties by Amnon Shreibman and Ruth Shreibman)

55.     Fifth Third incorporates the averments of the preceding paragraphs as if fully set forth herein.

56.     Amnon Shreibman and Ruth Shreibman are also in default of their respective obligations under the Loan Documents, including specifically those obligations set forth in the Guaranties.

57.     As a result of the Trust's and Amnon Shreibman's defaults under their respective obligations under the Loan Documents and the Amnon Shreibman Guaranty, Fifth Third is entitled to judgment against Amnon Shreibman in an amount no less than $13,794,729.54, plus interest at a rate equal to the maximum rate allowed by law, late charges, and costs of collection, including attorneys' fees and expenses, that have accrued and will accrue until such judgment is paid in full, plus any Swap Agreement termination fees, plus amounts necessary to cover current unpaid property taxes as of June 7, 2010 in an amount no less than $135,991.00 and additional property and other taxes assessed against the Collateral.

58.     As a result of the Trust's and Ruth Shreibman's defaults under their respective obligations under the Loan Documents and the Ruth Shreibman Guaranty, Fifth Third is entitled to judgment against Ruth Shreibman in an amount no less than $13,794,729.54, plus interest at a rate equal to the maximum rate allowed by law, late charges, and costs of collection, including attorneys' fees and expenses, that have accrued and will accrue until such judgment is paid in full, plus any Swap Agreement termination fees, plus amounts necessary to cover current unpaid property taxes as of June 7, 2010 in an amount no less than $135,991.00 and additional property and other taxes assessed against the Collateral.

## COUNT V
### (In the Alternative- Writ of Possession)

59.     Fifth Third incorporates the averments of the preceding paragraphs as if fully set forth herein. In the event the Court determines not to appoint a Receiver, Fifth Third prays the Court will issue a Writ of Possession.

60.     Section 5.1 of the Deed of Trust specifically states, in pertinent part as follows:

> [The Trust] hereby assigns and transfers to [Fifth Third] all of [the Trust's] right, title, interest, and estate in all and to the following...: (a) the Leases; (b) all future leases, rents and profits now or hereafter arising under the Leases and otherwise with respect to the Mortgaged Property or any part thereof...; (c) any sums to which [the Trust] may become entitled in any court proceeding involving the bankruptcy, insolvency or reorganization of any occupant; and (d) any payments made by any occupant in lieu of rent.

> [The Trust] agrees that, immediately upon request of [Fifth Third], [the Trust] will execute, acknowledge and deliver specific separate assignments of any Leases or contracts and/or any future Leases or contracts affecting or concerning the Mortgaged Property or any part thereof. (See Exhibit C, Deed of Trust, § 5.1).

61.     As a result of the Events of Default under the Loan Documents, Fifth Third is entitled to receive all Rents generated by the Mortgaged Property. Therefore, the Trust should be required to place Fifth Third in immediate possession of all of the Trust's right, title, interest and estate in the Leases and any proceeds thereof so that Fifth Third may apply the same to the outstanding balance due under the Loan Documents.

62.     Fifth Third is entitled to issuance of a Writ of Possession, pursuant to T.C.A. §29-30-101, *et seq.*, directing the Sheriffs of Rutherford County, Tennessee and Davidson County, Tennessee, as appropriate, to take possession of all monies currently, or in the future, constituting Rents and to deliver such Rents and all proceeds thereof to Fifth Third.

## COUNT VI
### (Claim for Prejudgment Attachment)

63. Fifth Third incorporates the averments of the preceding paragraphs as if fully set forth herein.

64. Fifth Third is entitled to prejudgment attachment on all of the Defendants' nonexempt property with the State of Tennessee pursuant to T.C.A. §29-6-101, *et seq.*

65. Fifth Third has monetary claims that are based in contract law, including causes of action for judgment against the Trust and the Guarantors as a result of breach of the Loan Documents.

66. Upon information and belief, and based upon statements by Amnon Shreibman that he has considered the possibility of relocating his primary personal residence and assets to the State of Israel, the Defendants are preparing to remove property, including possible Collateral, out of the State of Tennessee without leaving sufficient remaining funds or property for the payment of their obligations under the Loan Documents.

67. On information and belief, the property to be removed includes several million dollars in bank accounts located in banks other than Fifth Third (the "Bank Accounts").

68. On account of the multiple Events of Default under the Loan Documents by the Defendants outlined above, prejudgment attachment should be imposed on the assets of the Defendants, including, without limitation, the funds deposited in the Bank Accounts, to secure the repayment of all obligations owing to Fifth Third and all damages caused by Defendants to Fifth Third.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff Fifth Third prays for the following relief against the Trust, Amnon Shreibman and Ruth Shreibman:

A.    That the Court appoint the Receiver to take possession and control of the Collateral; to maintain and preserve the Collateral; that the Court grant the Receiver all of the powers, duties, authority, and protections ordinarily granted to a receiver and necessary to possess, maintain, and preserve the Collateral, including, without limitation, the power to sell the Collateral, or any part thereof, pursuant to 28 U.S.C. § 2001, et seq., upon request by Fifth Third and in accordance with such terms as are hereafter approved by Fifth Third and the Court; that the Receiver be compensated as provided herein; and that the Court set the Receiver's bond as provided herein;

B.    That the Court grant Fifth Third and the Receiver injunctive relief to, among other things, enjoin the Defendants (and their agents and all parties acting by, through, or in concert with them) from interfering with the duties of the Receiver, to direct the payment of revenues to the Receiver, to enjoin other parties from seeking recovery against the Trust, the Collateral, except in accordance with the relief requested herein, and for all other relief that may become necessary to maintain, preserve, and protect the Collateral and in aid of the duties conferred on the Receiver by the Court;

C.    That the Court enter judgment against the Trust in an amount no less than $13,794,729.54, plus accrued interest, late charges, overdraft fees, attorneys' fees and expenses, plus any Swap Agreement termination fees, plus any amounts necessary to cover current unpaid property taxes and any additional property and other taxes assessed against the Collateral;

D.     That the Court enter judgment against Amnon Shreibman in an amount no less than $13,794,729.54, plus accrued interest, late charges, overdraft fees, attorneys' fees and expenses, plus any Swap Agreement termination fees, plus any amounts necessary to cover current unpaid property taxes and any additional property and other taxes assessed against the Collateral;

E.     That the Court enter judgment against Ruth Shreibman in an amount no less than $13,794,729.54, plus accrued interest, late charges, overdraft fees, attorneys' fees and expenses, plus any Swap Agreement termination fees, plus any amounts necessary to cover current unpaid property taxes and any additional property and other taxes assessed against the Collateral;

F.     That the Court enter issue a Writ of Possession directing the Sheriffs of Rutherford County, Tennessee and Davidson County, Tennessee, as appropriate, to take possession of all monies currently, or in the future, constituting Rents and to deliver such Rents and all proceeds thereof to Fifth Third;

G.     That the Court enter an Order imposing prejudgment attachment on the assets of the Defendants, including, without limitation, all funds in the Bank Accounts, to secure the repayment of all obligations owing to Fifth Third and all damages caused by Defendants to Fifth Third; and

H.     That the Court enter an Order providing Fifth Third such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

WALLER LANSDEN DORTCH & DAVIS, LLP

By:

David E. Lemke (#013586)
Eric B. Schultenover (#020981)
Daniel W. Flournoy (#026304)
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Ph: 615-244-6380
Fx: 615-244-6804
David.Lemke@wallerlaw.com
Eric.Schultenover@wallerlaw.com
Daniel.Flournoy@wallerlaw.com

*Attorneys for Plaintiff*

*[verification on following page]*

# VERIFICATION

I, *Grady Thurman*, being first duly sworn and under oath, state that I am one of the duly appointed *VP, Commercial Real Estate Grp* at Fifth Third Bank; that I have read the foregoing Verified Complaint; that I am personally knowledgeable of the facts asserted in the Verified Complaint or otherwise know of the facts based upon diligent investigation and reports; and that said facts are true and correct based upon my present knowledge, information and belief.

_____
(Signature)

*Grady Thurman*
_____
(Name)

Sworn to and subscribed before me this 7th day of June, 2010.

_____
Notary Public

My Commission expires: *4-23-2013*

State of Tennessee

County of Davidson

LETA J. MEEK
STATE
OF
TENNESSEE
NOTARY
PUBLIC
DICKSON COUNTY, TENN.

My Commission Expires APR 23, 2013